# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

In the matter of:    )

)       Adversary Proceeding

DONALD H. BAILEY    )

(Chapter 11 Case Number <u>07-41381</u>)    )    Number <u>09-4002</u>

)

*Debtor*    )

)

)

)

DONALD H. BAILEY    )

)       **FILED**

*Plaintiff*    )    Samuel L. Kay, Clerk

)    United States Bankruptcy Court

)    Savannah, Georgia

v.    )    *By lbarnard at 12:51 pm, Nov 18, 2010*

)

HAKO-MED USA, INC.,    )

and    )

KAI HANSJURGENS    )

)

*Defendants*    )

## MEMORANDUM AND ORDER

A trial of the above-captioned case was conducted on September 17, 2010.

The parties' Proposed Consolidated Pre-Trial Order contained no stipulations of fact.

<u>Pretrial Order</u>, Dckt. No. 81 (May 21, 2010).

## FINDINGS OF FACT

The litigation as pleaded raised numerous allegations arising out of a business relationship between Plaintiff ("Debtor") and Defendants. At the opening of trial, counsel for Debtor stated that the single theory on which he would proceed would be a claim that Defendants tortiously interfered with Debtor's contractual relations. Debtor claims that this interference entitles him to actual damages, attorney fees, and punitive damages.

Debtor, Dr. Donald Bailey, is a physician who has been practicing in Savannah, Georgia, for over twenty years. He practices as a primary care physician in family medicine, and in 2004 he became aware of a medical equipment device that Defendants manufactured and distributed. The Hako-Med PRO ElecDT 2000 and VasoPulse 2000 (together the "Unit"), when used together, are designed to treat patients non-invasively for pain. The devices are frequently, but not exclusively, used to treat lower back pain. Because of Debtor's experience with these machines and the encouraging results reported by his patients who suffered from chronic or acute pain, Debtor entered into distributorship discussions with the Defendants and ultimately became a distributor of this medical equipment. That contract expired, at least in its initial term, on January 31, 2006. Before and after the entry of that agreement Debtor purchased a total of eighteen Units for a total of $388,200.00 (Invoices, Exhibit D-3), some of which he intended to use in his practice, but most of which he intended to sell to other medical providers pursuant to his distributorship agreement.

He paid cash and began marketing the Units.  He experienced difficulties in the marketplace because, as it was reported to him, some of the end users were unable to obtain reimbursement from health insurance programs commensurate with the anticipated income stream from the Units.  There is a dispute as to whether Defendants created that expectation, but a determination of that dispute is unnecessary in this case.  Even though the distributorship agreement contains a disclaimer indicating that Defendants were not providing billing advice or recommendations and Debtor signed an acknowledgment that he was not relying on any such recommendations, it is clear that in reality Debtor was being provided such information directly by Defendants or by those who were selling Defendants' products.  He testified that potential customers with whom he was working informed him that those were not appropriate billing codes or reimbursement levels and that he brought that to Hansjurgens's attention.  As a result of those conversations Hansjurgens engaged Peer Review Network, Inc. to make recommendations about appropriate billing codes that could be used; its recommendations are found in Exhibit P-4.

Those recommendations resulted in a lower potential reimbursement level than Defendants had been touting.  While fully understanding that the documents executed by the parties disclaimed any such billing advice by the Defendants and an acknowledgment by Debtor that he was not relying on such advice, it is still apparent that Debtor's questions about the level of permissible reimbursement put an additional strain on the relationship between the parties.  It clearly soured the relationship between the parties and caused Debtor to stop marketing the Units.  In the meantime, Debtor's license to practice medicine was

3

revoked. This eliminated his ability to use the Hako-Med equipment in his practice.

This Court previously ruled that a number of the disputes between the parties were subject to a mandatory arbitration clause. However, I held that clause to be effective only with respect to claims arising before January 31, 2006. Order, Dckt. No. 43 (October 8, 2009). After January 31, 2006—after the expiration of the distributorship agreement, and therefore outside the mandatory arbitration provision—Debtor owned multiple Units which he could only attempt to resell. In fact, he made certain marketing efforts and sold one Unit to Dr. William Odom on eBay.

In the spring of 2007 Gary Pulsfus approached Debtor and informed him that Pulsfus was involved in a company known as New River, a medical equipment rental company, and was interested in learning about the Hako-Med equipment that Debtor owned. His company already owned some Units and was leasing them to physicians who used them in their medical practices. Pulsfus believed that there was a tremendous market for this equipment in alleviating patients' suffering from chronic pain. However, because of the high capital investment necessary to purchase a Unit, New River was looking for a different business model. New River expressed to Debtor that it would be willing to pay $1,000.00 per month per Unit if Debtor would lease them to New River. New River's business model in turn involved placing the Units in practicing physicians' offices where they could be used in the medical practice. New River would be paid according to the terms worked out with those providers.

New River identified physicians' practice groups in Florida and one in Baltimore, Maryland, all of which were familiar with the Units and were anxious to place them in their practices. Pulsfus believed that there was a market for at least fifteen Units in the Baltimore area and perhaps a similar number in Florida. The arrangement with the doctor in the Baltimore practice, Dr. Shawn Dhillon, never materialized after Defendants wrote a letter to Dhillon which has been marked as Plaintiff's Exhibit P-6. The letter requested that Dhillon cease and refrain from using any of Hako-Med's intellectual property and made some assertions that any training and labeling of the devices would be illegal under federal law. Dhillon stopped negotiating with New River after receiving this letter. I find that Dr. Dhillon's refusal to further negotiate was caused by Hansjurgens's threatening letter.

Debtor continued to work with New River, however, and Pulsfus took him to see Drs. Barros and Alfonso (the "Florida Physicians") who were leasing some new Units from New River, but wanted to expand that area of their practices. During one of their visits they encountered Marty Ellis, an independent sales representative for the Defendants and the same individual who had originally sold the equipment to Debtor. Ellis confronted Debtor and after that confrontation, and a subsequent telephone conversation in which Defendants issued threats of legal action against the Florida Physicians, they called off any further negotiations to lease the equipment from New River.

Defendant Hansjurgens denies that any threatening telephone conversation

with the Florida Physicians ever occurred. However, Pulsfus testified to the following: The day after the confrontation in the doctors' office with Mr. Ellis, Ellis called Pulsfus, stated that it was illegal for Debtor to sell the Hako-Med equipment, and asked that a meeting be set up with Pulsfus and the Florida Physicians. In the meeting in the doctors' office, Ellis called Hansjurgens, who was connected by telephone, and repeated the statement that any use on their part of equipment sold by Debtor was illegal and that he would sue the doctors. Hansjurgens demanded $10,000.00 to recertify and provide a warranty for each of the Units that the doctors were considering leasing and—in very heated exchanges over the phone lasting fifteen to twenty minutes—made threats of such legal action as resulted in the Florida Physicians informing Pulsfus that they wished the leased equipment be removed from their offices and in their refusing to continue negotiations for any of the additional equipment Debtor had available. I find that the Florida Physicians' refusal to continue in the agreement was caused by Hansjurgens's threats during that conversation.

Hansjurgens states that he does not recall such a conversation. When confronted with conflicting evidence by two witnesses directly contradictory to one another, the Court must conclude by a preponderance of the evidence which facts will be operative for the purposes of its decision. Taking all the evidence into consideration, I conclude that the version to which Pulsfus testified is, in fact, what happened. First, although he and Dr. Bailey both confirmed essentially the same version of events, Pulsfus does not have an interest in the outcome. Dr. Bailey and Hansjurgens are the litigants and have an economic stake in the outcome. Accordingly, that independence lends additional weight to his

AO 72A
(Rev. 8/82)

testimony.  Second, the conduct to which Pulsfus testified is consistent with the tone of Hansjurgens's letter to Dr. Dhillon in Baltimore, and because of the similarity of the conduct and the time during which it occurred, I again conclude that the communication to which Pulsfus testified, did in fact, occur.  Faced with the inability to market Dr. Bailey's Hako-Med products, Bailey shut down his efforts to continue any marketing and ultimately New River closed its doors.

While Hansjurgens testified as to benign reasons why his conversations with the Florida Physicians and his letter to Dr. Dhillon might not constitute a prohibited tortious interference, I find that the time when these actions took place was suspiciously contemporaneous with questions Dr. Bailey raised about billing procedures which he believed Defendants were promoting.  I conclude that the motivation of Defendants in the actions they took regarding the Florida Physicians and Dr. Dhillon (together the "Potential Purchasers") were not motivated solely out of altruistic motives but contained an element of bad faith toward Dr. Bailey.

## CONCLUSIONS OF LAW

### Legal Standard

> The elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to

enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Blakey v. Victory Equip. Sales, Inc., 259 Ga. App. 34, 38(2)(d) (2002); *see also* Renden, Inc. v. Liberty Real Estate Ltd. P'ship III, 213 Ga. App. 333 (1994); Green v. Johnston Realty, 212 Ga. App. 656 (1994); Integrated Micro Sys. v. NEC Home Elecs. (USA), 174 Ga. App. 197, 200(3) (1985).

### (1) Improper Action or Wrongful Conduct Without Privilege

This first element requires the Plaintiff to show that Defendant acted improperly or wrongfully, and that such action was without privilege. "The first element's requirement that the tortfeasor acted 'without privilege' requires proof that the defendant was an intermeddler or 'stranger' to the business relationship at issue." ASC Constr. Equip. USA, Inc. v. City Commercial Real Estate, Inc., 303 Ga. App. 309, 313 (2010) (citing Cox v. City of Atlanta, 266 Ga. App. 329, 332(1) (2004)). In the instant case Defendants were strangers to the business relationship between Debtor and his customers. While Debtor purchased the Units from Defendants, that sale had been completed and Defendant had no remaining interest in either the Units or the parties to the contracts Debtor was pursuing. *See* Cox, 266 Ga. App. at 332(1) ("[W]here 'a defendant had a legitimate interest in either the contract or a party to the contract,' he is not a stranger to the contract itself or to the business relationship giving rise thereto and underpinning the contract."); Tidikis v. Network for Med. Commc'ns & Research LLC, 274 Ga. App. 807, 812(4) (2005) ("[I]f the defendant has a

AO 72A
(Rev. 8/82)

legitimate economic interest in either the contract or a party to the contract, then the defendant is not a stranger to the contract and acts with privilege.").

A showing of improper conduct requires more than proof that "defendant simply persuaded a person to break a contract." *See e.g.,* Kirkland v. Tamplin, 285 Ga. App. 241, 244(1)(b) (2007). The requirement that the conduct be wrongful or improper requires a showing that the conduct was "wrongful in itself." Id. This has been interpreted to mean "wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." Id.

In the instant case, Debtor has proven that Hansjurgens threatened legal action against the Potential Purchasers. Hansjurgens sent a letter to Dr. Dhillon demanding that he cease and refrain from the use of Hako-Med's intellectual property and asserting that training on and re-labeling of the devices is prohibited by law. During a telephone call Hansjurgens also informed the Florida Physicians that their use of the equipment was illegal and that he would sue them if they used the equipment.

In determining whether this conduct rises to the level of "improper" or "wrongful," the Georgia courts have adopted the approach of the Restatement of Torts. Orkin Exterminating Co., Inc. v. Martin Co., 240 Ga. 662, 666 (1978) (affirming the trial court's use of the standards set out in RESTATEMENT (FIRST) OF TORTS § 768 for determining

privilege); <u>Halverson v. Murzynski</u>, 226 Ga. App. 276, 277 (1997) (applying the standards

set out in RESTATEMENT (SECOND) OF TORTS § 767 for determining whether interference in

a contractual relationship was improper).

> The Restatement provides:
>
> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767 (2010). This list is not exhaustive, and it

represents the factors considered in the balancing process that have been the subject of

judicial decision. <u>Id.</u> at cmt. b. Accordingly, I must weigh these factors to determine

whether Hansjurgens's actions—the letter to Dr. Dhillon and the telephone call to the Florida

Physicians—were improper.

## (a) The Nature of Hansjurgens's Conduct

"The nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not . . . ." Id. at cmt. c.  Under the Restatement an improper interference

> may be a simple request or persuasion exerting only moral pressure[,] a statement unaccompanied by any specific request but having the same effect as if the request were specifically made[,] a threat by the actor of physical or economic harm to the third person or to persons in whose welfare he is interested[, or] the promise of a benefit to the third person if he will refrain from dealing with the other.

RESTATEMENT (SECOND) OF TORTS § 766, cmt. k (2010).  However, as I mentioned above, Georgia law requires that the "plaintiff must show more than that the defendant simply persuaded a person to break a contract." Kirkland, 285 Ga. App. at 244(1)(b).  Under Georgia law, improper conduct requires a showing that the conduct was "wrongful in itself," which means "wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." Id.

Threats of lawsuits, without a showing that the lawsuits are unfounded, are insufficient to support a claim of tortious interference. Bell v. Sasser, 238 Ga. App. 843, 852 (1999); Nager v. Lad'n Dad Slacks, 148 Ga. App. 401, 401 (1978) (holding that threats of lawsuits against individuals suspected of being interested in seeking employment with a

competitor, even when paired with disparaging remarks about the competitor made to suppliers, is insufficient to constitute tortious interference).

In the instant case, Hansjurgens made four separate threatening allegations to Debtor's potential business partners. First, Hansjurgens demanded Dr. Dhillon cease and desist from using Hako-Med's intellectual property. Hansjurgens cited 15 U.S.C. §§ 1114, 1125 and 17 U.S.C. § 501 for this proposition. Debtor showed that his intended use of the Units included no violation of copyright or trademark laws. Debtor testified that he only intended to resell the devices and manuals as he purchased them. There was no copying, reproduction, counterfeit, false designation of origin, or other violative use of the Hako-Med intellectual property. As such, Defendants' first threat of legal action was unfounded.

Second, Hansjurgens informed Dr. Dhillon that "training on Hako-Med devices is strictly regulated by federal regulations," and that training done outside Hako-Med's 510(k) approval "may be deemed promoting medical devices without the proper licensing." Letter, Exhibit P-6. Pulsfus testified that he was trained by Marty Ellis, and that he was informed that he could then train his employees on the Units. He also testified that in his forty years in the hospital administration and Medicare-related businesses, he has been made aware of no Food and Drug Administration limitation concerning training on medical devices. Defendants did not direct this Court's attention to any such limitation, and this Court has been unable to find any such limitation. Accordingly, Defendants' second threat of legal action was unfounded.

Third, Hansjurgens informed Dr. Dhillon that "tampering with any labeling of Hako-Med devices is illegal under government regulations . . . [and] may constitute criminal fraud." Id. However, in many situations re-labeling of devices is required. In fact if a "seller intends an article for different uses than those intended by the person from whom he received the devices, such . . . seller is required to supply adequate labeling in accordance with the new intended uses." 21 C.F.R § 801.4. Federal law may have required Dr. Dhillon to re-label the devices, and any assertion that such re-labeling was prohibited by law is incorrect.[1] Accordingly, Defendants' third threat of legal action was unfounded.

Fourth, Hansjurgens informed the Florida Physicians that their use of the Units was illegal without a $10,000.00 recertification fee to be paid to Hako-Med. Hansjurgens threatened to sue the Florida Physicians if they continued with their plan. Pulsfus testified at the hearing that there is no legal prohibition of the resale of the Units without a recertification fee. This Court can find no legal support for Hansjurgens's threat to sue the doctors if they used the Units without paying him a recertification fee. Accordingly, Defendants' fourth threat of legal action was unfounded.

---

[1] I note that the Unit was authorized to be marketed "[f]or adjunctive use in post-traumatic pain syndromes; for management and symptomatic relief of chronic (long term) pain, as an adjunctive treatment in the management of post surgical pain problems; relaxation of muscle spasms; prevention or retardation of tissue atrophy; increasing blood circulation; muscle re-education; immediate post-surgical stimulation of calf muscles to prevent phlebothrombosis; and maintaining or increasing range of motion. Stimulate [sic] peripheral nerves for the purpose of providing pain relief and to stimulate motor nerves for the purpose of muscle rehabilitation." 510(k) Approval Letter, Exhibit D-7. Debtor threatened Dr. Dhillon with legal action if he did re-label the Units. I need not determine whether Debtor would have needed to re-label the devices to lease them as planned, as the issue is not whether such re-labeling was required, but whether it was prohibited by law as threatened by Hansjurgens.

For the reasons stated above, Hansjurgens's conduct was wrongful in itself. He made unfounded threats of legal action in order to bully the Potential Purchasers out of negotiations with Debtor. Such conduct rises to the standard of "wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." Kirkland, 285 Ga. App. at 244(1)(b).

### (b) Hansjurgens's Motive

As I found above, Defendants acted in bad faith. Defendants purposefully went into the marketplace and dissuaded the Potential Purchasers from entering into contracts with Debtor through threats of unfounded lawsuits. *See* Lewis v. D. Hays Trucking, Inc., 701 F. Supp. 2d 1300, 1313 (N.D. Ga. 2010) (applying O.C.G.A. § 13-6-11) ("Bad faith requires more than 'bad judgment' or 'negligence,' rather the statute imports a 'dishonest purpose' or some 'moral obliquity' and implies 'conscious doing of wrong' and a 'breach of known duty through some motive of interest of ill will.'"). That is enough to satisfy this element of the test.

### (c) Debtor's Interests with Which Hansjurgens Interfered

Pulsfus testified that the deals with the Potential Purchasers were imminent, and he believed there was demand in the market for the Units. This testimony was uncontroverted. Because the deals were imminent and Debtor had just begun to explore the market for resale of the Units, he had a protected interest in marketing them free of

Defendants' interference.

### (d) The Interests Sought to Be Advanced by Hansjurgens

Hansjurgens sought to advance his own pecuniary interest. Every Unit leased from Debtor was a Unit Hansjurgens did not sell. His dealings with the Potential Purchasers are consistent with his bad faith motive. By interfering with Debtor's potential contractual relations, Defendants opened the path for more sales of their Units.

### (e) The Balance of the Social Interests of the Parties

Debtor sought to enter into a contract to provide leased goods to willing participants. Defendants sought to interfere with this contract, not through reason or persuasion, but through unjustified threats. Defendants presented no reasoned analysis and instead threatened the Potential Purchasers with litigation and possible criminal prosecution. Defendants have demonstrated no viable social interest to balance against Debtor's attempt to participate in a willing transaction.

### (f) The Proximity of Hansjurgens's Conduct to the Interference

Pulsfus testified that Dr. Dhillon stopped negotiating immediately after receiving the letter, and that the Florida Physicians requested that the Units be removed from their property one day after the phone call with Hansjurgens. As noted above, I find that the Potential Purchasers stopped dealing with Debtor as a direct and proximate result of Defendants' actions.

### (g) The Relations Between the Parties

Debtor and Defendants were competitors, each supplying the Units to the market. As such, Defendants are entitled to more leeway in persuading the Potential Purchasers not to do business with him. RESTATEMENT (FIRST) OF TORTS § 768 cmt. i. However, even under this heightened standard for what is improper, I find that Defendants' actions went beyond mere competition in the marketplace and constituted tortious interference. Id.

### (2) Defendants Acted With the Intent to Injure

As I held above, Defendants acted in bad faith. I further find that they acted with malice and intent to injure. There is no other explanation for Defendants' actions toward all of Debtor's Potential Purchasers.

### (3) Defendants Caused the Potential Purchasers to Discontinue Negotiations with Debtor

As I held above, the Potential Purchasers' discontinuation of negotiations was directly and proximately caused by Defendants' interference with the potential business relations.

### (4) Defendants' Tortious Conduct Proximately Caused Damage to Debtor

Pulsfus testified that the negotiations were cut short immediately after Defendants contacted the Potential Purchasers, and that they did not want to be sued, so they

ceased negotiations. He further testified that the deals with the Potential Purchasers were "imminent," and that Debtor was on track to receive $1,000.00 per month for each of his 18 machines, with the possibility of adding more later.

This testimony was uncontested and establishes that Defendants' conduct proximately caused damage to Debtor in that he was unable to place the machines in facilities that were ready, willing, and able to pay him for the use of the Units.

Conclusion

Because Defendants participated in wrongful conduct without privilege, acted purposely and with the intent to injure, caused the Potential Purchasers to fail to enter into an anticipated business relationship with Debtor, and because that conduct proximately caused damage to Debtor, I find that Defendants tortiously interfered with Debtor's potential business relations.

Actual Damages

Plaintiff contends that the actions of Defendants rendered the equipment—for which he had paid over $380,000.00—worthless. He contends that the actions of the Defendants completely destroyed any market for the resale of the equipment and that he should be refunded the full amount which he paid for the equipment. He further states that he is ready, willing, and able to allow Defendants to reclaim the equipment that he has on hand should they wish to do so. Defendants, while not conceding any liability in

this matter, certainly contest the measure of damages which would be appropriate.

While there may be differences in the testimony as to the value of used equipment, a discounted value off of the original retail price is appropriate. That discount is appropriate because equipment that cannot be sold as new is simply not as valuable as brand new equipment if for no other reason than the fact that Dr. Bailey cannot deliver a manufacturer's warranty to any prospective purchaser as would have been the case while the distributorship agreement was in force.

Debtor paid an average of $21,313.89 for each Unit for his eighteen Units.[2] Invoices, Exhibit D-3. While this is the price of a new Unit, used prices are more difficult to establish. However, Janet Cubbage, Debtor's sister and an employee for ERS, Inc., inquired about the purchase of a used Unit from Defendants. She testified that upon her inquiry, she was offered a $5,000.00 discount if she bought a "demo" model Unit. Accordingly, I hold that a used Unit is $5,000.00 less valuable than a new Unit. Based on evidence at trial, I find that Debtor's eighteen used Units each had a net resale value of $16,313.89.

Because of Defendants' interference with Debtor's potential business relations, Debtor was deprived of the used value of the Units, which he could have leased to

---

[2] Debtor paid a total of $388,200.00 for eighteen Units, which included $4,550.00 in Shipping and Handling. Invoices, Exhibit D-3. This figure includes an unlabeled "Adjustment" from each of the invoices. This adjustment is apparently a discount of some kind and has been deducted from Debtor's cost of the Units.

New River or he could have sold for $293,650.02.  Accordingly, I award damages in the amount of $293,650.02.

Punitive Damages

"Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). As mentioned above, Defendants acted with malice and intent to injure.  Because Debtor specifically prayed for punitive damages in his complaint (Amended Complaint, Dckt. No. 23-1, ¶¶ 56-59 (June 22, 2009)), and because Defendant acted with malice in interfering with Debtor's potential business relations, I find that the evidence produced at trial supports the award of punitive damages.  This Court will set a hearing for a trial on the amount of damages sufficient to "deter, penalize, or punish the defendant in light of the circumstances of the case." O.C.G.A. § 51-12-5.1(d)(2).

Attorney Fees

O.C.G.A. § 13-6-11 provides that:

[t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff

unnecessary trouble and expense, the [factfinder] may allow them.

Debtor specifically prayed for attorney fees in his Amended Complaint. Amended Complaint, Dckt. No. 23-1 ¶¶ 59-60 (June 22, 2009). And as mentioned above, I find that Defendant has acted in bad faith. After this Court makes such a finding, Georgia law authorizes me to add the costs of litigation to the damages assessed against the Defendants. Even though this code section arises under the Contract Title of Georgia law, a tort will support the allowance of attorney fees under O.C.G.A. § 13-6-11. *See, e.g.*, Fertility Tech. Res., Inc. v. Lifetek Med., Inc.. 282 Ga. App. 148, 153 (2006) ("Because tortious interference is an intentional tort, which indicates bad faith, the award on that claim authorized an award under O.C.G.A. § 13-6-11.").

While I believe the Defendants have proceeded in good faith in defending this action, for purposes of O.C.G.A. § 13-6-11, the bad faith requirement looks for "bad faith connected with the transaction and dealings out of which the cause of action arose, rather than bad faith in defending or resisting the claim after the cause of action has already arisen." Monterrey Mexican Rest. of Wise, Inc. v. Leon, 282 Ga. App. 439, 451 (2006) (quotations omitted).

Because Debtor would have been able to sell or lease the Units absent interference from Defendants, because Debtor prayed for attorney fees in his pleadings, because Defendant acted in bad faith, and because Defendant's actions caused unnecessary

trouble and expense to Debtor, the expenses of litigation are included in the damages awarded by this Order.

The amount of attorney fees to be awarded is a question for the factfinder "because the questions of reasonableness and necessity of the expenses of litigation and attorney fees are matters for expert opinion." American Med. Transp. Group, Inc. v. Glo-An, Inc., 235 Ga. App. 464, 466 (1998). Because no evidence was presented on this issue at trial, this Court will set a hearing for a trial on the amount of attorney fees to be granted as part of the damages pursuant to O.C.G.A. § 13-6-11.

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that judgment be entered in favor of Debtor and against Defendants in the amount of $293,650.02 in actual damages. A separate trial will be set for determination of punitive damages and attorney fees. Because this judgment disposes of fewer than all of the claims asserted, it shall be deemed interlocutory in nature. Fed. R. Civ. P. 54(b).

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This _16th_ day of November, 2010.