# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
## Savannah Division

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | Adversary Proceeding |
| DONALD H. BAILEY | ) | |
| (Chapter 11 Case Number <u>07-41381</u>) | ) | Number <u>09-4002</u> |
| | ) | |
| *Debtor* | ) | |
| | ) | |
| DONALD H. BAILEY | ) | |
| | ) | **FILED** |
| *Plaintiff* | ) | Samuel L. Kay, Clerk |
| | ) | United States Bankruptcy Court |
| | ) | Savannah, Georgia |
| | ) | By camerson at 2:49 pm, Apr 07, 2011 |
| v. | ) | |
| | ) | |
| HAKO-MED USA, INC. | ) | |
| and | ) | |
| KAI HANSJURGENS | ) | |
| | ) | |
| *Defendants* | ) | |

## ORDER AWARDING PUNITIVE DAMAGES AND ATTORNEYS' FEES

### FINDINGS OF FACT

This adversary proceeding commenced on January 28, 2009, was tried on September 17, 2010, and the Court entered a Memorandum and Order on November 18, 2010, awarding actual damages in the amount of $293,650.02. That Order allowed the award of attorneys' fees and punitive damages to Plaintiff, but reserved a ruling on those amounts.

The attorneys' fees and punitive damages issues were tried on March 8, 2011. The Court's award of actual damages in the November Order was computed on a $16,313.89 per unit resale value for eighteen units, for a total of $293,650.02. Defendants' counsel has alleged in subsequent pleadings in this case that the Court committed error by including damages from one unit (which the Debtor had actually succeeded in selling) in its computation of damages. Motion, Dckt. No. 102 (Dec. 2, 2010); Motion, Dckt. No. 104 (Dec. 3, 2010). After a review of the entire record I agree with the Defendants' contention and the compensatory damages award in this matter will be reduced to $277,336.13.

In my November Order, I held that "Defendants acted with malice and intent to injure," and that "the evidence produced at trial support[ed] the award of punitive damages." Bailey v. Hako-Med USA, Inc., Case. No. 09-4002, p. 19 (Bankr. S.D. Ga.) (Nov. 16, 2010). I set the hearing date for punitive damages and attorneys' fees and opened post-judgment discovery to determine the amount required to "punish, penalize, or deter" Defendants.

To that end, Plaintiff propounded post-judgment discovery to the Defendants which went largely unanswered. Plaintiff then filed a Motion to Compel Discovery and the Court entered an Order on March 3, 2011, ordering Defendants to produce all requested documents on the previously scheduled date, March 8, 2011, for the Court's inspection so that a ruling could be made on their discoverability. Defendants failed to appear at trial,

failed to produce any additional documents, and their counsel was unable to supplement the record. Nevertheless, Debtor announced that he was ready for trial and proceeded, contending that punitive damages should be awarded in an amount which would be sufficient to punish and deter the Defendants from repeating the conduct which necessitated the original complaint.

In addition to the facts which led to this Court's finding of malice and intent to injure, Debtor points to the fact that Defendants:

1. Without seeking relief from stay in this Court, demanded arbitration of certain claims between the Defendants and the Debtor;

2. Filed a complaint with the State Bar of Georgia relating to Mr. McCallar's representation of the Debtor;

3. Provided inadequate discovery responses;

4. Gave testimony which was evasive and intended to mislead or confuse the Court at the original trial; and

5. Have sold over 1,000 units in the past ten years, suggesting a gross revenue of $30 million[1] over that period, and had sold over a half million dollars worth of units to Plaintiff alone in a single year.

Defendant Hanjurgens was certainly evasive and uncooperative in his trial testimony. For

---

[1] Defendant Hansjurgens testified that the price of a unit is roughly $33,000.00 and that he sold "over a thousand units" in ten years in business. Transcript, Dckt. No. 141, pp. 12, 78.

example, the following excerpts are from Hansjurgens's testimony on September 17, 2010:

> Q. Who own[s] the stock in the corporation?
> A. I do own most of the stock.
> Q. Over 70%?
> A. Yes.
> Q. Over 90%?
> A. I'm not sure.
> Q. Okay. But between 70 and 90%?
> A. Again, I don't know the exact percentage, but definitely over 70%.
> Q. Okay. Who are the other stockholders?
> A. I can't recall right now. I have forgot. I would have to look.
> Q. You don't know who the stockholders are.
> A. I do not recall.
> Q. Okay. When was the last time you had the corporate shareholders meeting?
> A. I don't recall the exact date.
> Q. Have you had one in the last year?
> A. I'm sure we did. I don't recall.
> Q. Okay. Do you recall who attended that meeting?
> A. I do not recall the meeting nor the attendants.
> Q. Do you recall conducting the meeting?
> A. Again, I don't recall the meeting.
> Q. Okay. All right. Is it possible that somebody else conducted a meeting and just didn't invite you?
> A. I hardly doubt it.
> Q. So if somebody called a meeting, you did. Does your father own any stock?
> A. No, he does not.
> Q. Okay. And you cannot tell me who the other stockholders are.
> A. I think I answered the question a couple of times. No, I cannot.
> Q. Okay. Let me ask you this then. Would there be more than five other stockholders?
> A. I doubt that.
> Q. You doubt that.
> A. Yes.

> Q. Would there be more than three?
> A. Again, you can ask me the same question twenty times. I don't recall exactly who the other stockholders are.
>
> . . . .
>
> Q. And you are the president.
> A. Correct.
> Q. You are the CEO.
> A. Correct.
> Q. You are the Chairman of the Board.
> A. Correct.

Transcript, Dckt. No. 141, pp. 6-8.

> Q. In 2010, what were your gross sales?
> A. I don't recall.
> Q. Just give me [a rough] number.
> A. I don't recall.

Id. at 23.

> Q. Okay. And my only question was can you tell me when [was] the first time . . . you had no sales people on the street?
> A. And the question is I cannot tell you. The answer, I'm sorry.
> Q. Okay. You can't or you won't.
> A. I can't recall.

Id. at 45.

⚘AO 72A
(Rev. 8/82)

Defendants were similarly evasive and unresponsive in their answers to interrogatories:

(to Hako-Med)
Q. 2. How much cash do you have in your possession at this time and what is the average amount in your checking accounts, cumulatively, over the last 12 months?
A. 2. No Cash on hand. Past history: Defendant objects (relevance) to this request on the basis that the past history is irrelevant to defendants current net worth and the punitive damages hearing. Further, defendant objects to this request on the basis that it is vague, overbroad, and unduly burdensome.

(to Hansjurgens and Hako-Med)
Q. 3. a. Identify the name of any banking institution, savings and loan association, brokerage house, or credit union at which you maintain an account or have maintained an account in the past three (3) years.
b. Provide the account number, present balance and balance for the month end for each account for the past twelve months of each account described in paragraph 3a.
A. 3. Defendant objects (relevance) to this request on the basis that the past history is irrelevant to defendants current net worth and the punitive damages hearing. Further, defendant objects to this request on the basis that it is vague, overbroad, and unduly burdensome.

(to Hansjurgens)
Q. 16. Describe any legal interest you may have in a partnership, LLC or other business entity.
A. 16. Not aware of any.[2]

(to Hako-Med)
Q. 22. a. Do you have income from any other source?
b. Give the name and address of any entity providing you with this income.
c. Describe the amount of any such income.
A. 22. Defendant objects to this request on the basis that it makes no sense whatsoever.

---

[2]This Court takes note of Defendant Hansjurgens's conflicting answers to this interrogatory and the answer he gave during testimony on September 17, 2010.

Interrogatories, Dckt. Nos. 98-2, 98-4 (Nov. 29, 2010). Answers, Exhibit G. Based on Defendants' own testimony regarding the gross revenue over the last ten years, together with Defendants' evasiveness and unwillingness to disclose financial information, I find that Defendants operate a business which generated substantial cash flow and have considerable wealth.

Defendants take the position that even if the Court stands firm in its ruling—that Defendants tortiously interfered with Plaintiff's contract rights—Defendants' actions were justified by their concerns over a possible copyright infringement and FDA regulatory issues. Accordingly, the argument goes, any award of punitive damages and attorneys' fees should be mitigated.

## CONCLUSIONS OF LAW

### I. Punitive Damages

With regard to punitive damages, Georgia law provides that "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). However, "[p]unitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant." O.C.G.A. § 51-12-5.1(c). I have already found punitive damages to

be appropriate in this case, and I now take up the amount of punitive damages to be awarded.

Georgia law limits punitive damages to a maximum of $250,000.00 except in a few circumstances. O.C.G.A. § 51-12-5.1(g). One exception which is relevant in this case is that punitive damages are not limited to $250,000.00 "[i]n a tort case in which . . . it is found that the defendant acted . . . with the specific intent to cause harm . . . ." O.C.G.A. § 51-12-5.1(f). As I found in my November 16, 2010, Order, "Defendants acted with malice and intent to injure." <u>Bailey v. Hako-Med USA, Inc.</u>, Case. No. 09-4002, p. 19 (Bankr. S.D. Ga.) (Nov. 16, 2010). Accordingly, the punitive damages in this case are not limited to $250,000.00.

Having determined that there is no maximum limit imposed on the damages, this Court turns now determining what amount is sufficient to punish, penalize, or deter a defendant. Recognized factors which may be considered by the trier of fact in setting punitive damages in this case include:

1. The amount of actual damages awarded;

2. The profitability of the defendant's wrongdoing;

3. The financial circumstances of the defendant; and

4. The reprehensibility of defendant's conduct in the underlying litigation.

Hosp. Auth. of Gwinnett County v. Jones, 259 Ga. 759, 764 (1989) *cert. granted, vacated on other grounds*, 499 U.S. 914 (1991), *judgment reinstated* 261 Ga. 613 (1991) (listing non-exclusive factors, including numbers 1, 2, and 3); Hosp. Auth. of Gwinnett County v. Jones, 261 Ga. 613, 614 (1991) (noting that the purpose of punitive damages is to deter reprehensible conduct, number 4).

Debtor cites Middlebrooks v. Hillcrest Foods, Inc., an 11th Circuit case, as upholding the award of damages of even a ten-to-one ratio as not evidencing the sort of "bias" on the part of the trier of fact as would cause a reversal of its discretion to set punitive damages. 256 F.3d 1241, 1250 (11th Cir. 2001). Although Hako-Med asserts in its answers to Interrogatories 23 and 24 that it has no substantial assets and no license to sell its devices, that bare assertion is entitled to little weight in light of Defendants' general conduct throughout the case and their failure to produce documents which would support such a conclusory assertion. Hako-Med's and Hansjurgens's responses to Requests for Production of Documents revealed minimal information and demonstrate a cavalier attitude toward their duties as litigants. This Court draws an adverse inference from Defendants' concealment and assumes that truthful answers to those questions and production of documents would have been unfavorable to Defendants. Callahan v. Schultz, 783 F.2d 1543, 1545 (11th Cir. 1986) ("The 'adverse inference rule' provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.") (quoting Int'l Union (UAW) v. NLRB, 459 F.2d 1329, 1336 (D.C.

Cir.1972)) (punctuation omitted). I find that the concealment of that information was intentional, calculated to minimize Defendant's damages, and was possibly motivated by a desire to perpetrate a fraud on the Court.

Determining the amount of punitive damages is always a difficult task because this Court is tasked with awarding an amount sufficient to "punish, penalize, or deter" a defendant's behavior. O.C.G.A. § 13-6-11. In this case, however, the task is made even more difficult by Defendants' refusal to comply with discovery. The requested discovery would have illuminated Defendants' financial well-being and instructed this Court as to an amount which would have had its intended effect. Absent that evidence, and considering Defendants' testimony regarding Hako-Med's gross sales numbers over the last ten years and my resulting finding that Defendants have considerable wealth, I will award punitive damages which have their intended effect. The Supreme Court has noted that ratios which are "breathtaking" must "raise a suspicious judicial eyebrow." BMW of North America, Inc. v. Gore, 517 U.S. 559, 583 (1996). Having no desire to "raise a suspicious judicial eyebrow," this Court seeks to avoid any ratio of punitive damages to actual damages which may be considered "breathtaking." In further clarifying its holding, the Supreme Court held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 438 (2003). Accordingly, it appears that an award of punitive damages may not exceed a nine-to-one ratio.

After a review of all the records in the case and the factors outlined in this Order, I conclude that an award of punitive damages in double the amount of compensatory damages is necessary.

II. Attorneys' Fees

In the November Order I found that Defendants acted in bad faith in the underlying action from which the tortious interference claim arose, and that Plaintiff's attorneys' fees should be allowed pursuant to O.C.G.A. § 13-6-11. Accordingly, I ruled that attorneys' fees would be included in the damages awarded in that Order. I now take up the amount of attorneys' fees to be awarded.

Plaintiff's counsel presented detailed time records showing the nature of the work that was done and the applicable hourly rate for himself, his legal associate, and his staff. That application, Exhibit E, details attorneys' fees and costs totaling $66,690.25. Based on the expert testimony of James L. Drake, Jr., that his review of the billing reveals what he believes are reasonable fees and costs, and subject to a computational error[3] in the attorneys' fees that are being sought, I award the full amount of $61,965.25.

---

[3] An entry for November 22, 2010, states that CJM "Reviewed Order; worked on post judgment discovery request and motion" for 4.5 hours at an hourly rate of $300.00. The total fee for that entry is $6,075.00. This is an inadvertent overstatement of fees incurred by $4,725.00 and the attorneys' fees awarded by this Court will therefore be reduced by that amount.

After a review of all the records in the case and the factors outlined in this Order, I conclude that an award of punitive damages in double the amount of compensatory damages is necessary.

II. Attorneys' Fees

In the November Order I found that Defendants acted in bad faith in the underlying action from which the tortious interference claim arose, and that Plaintiff's attorneys' fees should be allowed pursuant to O.C.G.A. § 13-6-11. Accordingly, I ruled that attorneys' fees would be included in the damages awarded in that Order. I now take up the amount of attorneys' fees to be awarded.

Plaintiff's counsel presented detailed time records showing the nature of the work that was done and the applicable hourly rate for himself, his legal associate, and his staff. That application, Exhibit E, details attorneys' fees and costs totaling $66,690.25. Based on the expert testimony of James L. Drake, Jr., that his review of the billing reveals what he believes are reasonable fees and costs, and subject to a computational error[3] in the attorneys' fees that are being sought, I award the full amount of $61,965.25.

---

[3] An entry for November 22, 2010, states that CJM "Reviewed Order; worked on post judgment discovery request and motion" for 4.5 hours at an hourly rate of $300.00. The total fee for that entry is $6,075.00. This is an inadvertent overstatement of fees incurred by $4,725.00 and the attorneys' fees awarded by this Court will therefore be reduced by that amount.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that final judgment is entered in favor of the Plaintiff and against the Defendants in the following amounts: (1) Compensatory Damages in the amount of $277,336.13; (2) Punitive Damages in the amount of $554,672.26; and (3) Attorneys' Fees in the amount of $61,965.25, for a total of $893,973.64.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 7th day of April, 2011.

